(No. 75277■■■

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PAUL TAYLOR, Appellant.

*Opinion filed June 22, 1995.—Rehearing denied October 2, 1995.*

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven L. Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Arleen C. Anderson and Bradley P. Halloran, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

In the circuit court of Williamson County the defendant, Paul E. Taylor, entered a plea of guilty on June 9, 1992, to a charge of having committed the offense of first degree murder on or about January 18, 1992, while he committed a forcible felony, namely, an aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3)). On October 8, 1992, a jury found the 21-year-old defendant eligible for a death sentence pursuant to section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)) and, following a hearing concerning factors in aggravation and mitigation (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c)), returned a verdict on October 15, 1992, finding that there are no mitigating factors sufficient to preclude its imposition. Accordingly, the circuit court sentenced defendant to death. The cause comes directly to this court for review (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603), where defendant presents seven issues related to his sentencing.

Initially defendant contends that at sentencing he was denied the right to a fair and impartial jury for two reasons: because the circuit court erroneously seated a juror, Darryl Rendleman, who had formed an opinion to vote for a death sentence prior to hearing evidence and because the court erroneously excused a prospective juror, Doris McAnally, who was reluctant to vote for a death sentence.

With respect to the juror Rendleman, during defense counsel's examination of him the venireman expressed the view that the death penalty should apply to cases of "cold-blooded murder," described by him as those that occur for "no apparent reason," an example of which he gave as murder that occurs during the commission of another crime. When defense counsel asked, "There was

no apparent reason for [defendant] to kill [the victim in this case]. So are you predisposed at this time to give the death penalty under the charge that [defendant] has already pled guilty to?" the juror responded in the affirmative. Later, the following exchange between defense counsel and the venireman took place:

"Q. *** My initial question is have you formed an opinion as you sit there right now without ever hearing any evidence in this case from this Court?

A. Yes, I have.

Q. So one side is starting out at an advantage as we sit here right now?

A. Yes and no.

Q. What do you mean by yes and no?

A. Because I still haven't heard all the whole thing, the whole situation.

Q. Is it going to take considerable evidence to change your mind?

A. It probably will not.

Q. What types of things would you look at in deciding that the death penalty should be imposed?

\* \* \*

A. A lot of background circumstances.

Q. On those two points when you say background, what are you referring to, sir?

A. What kind of things have happened in a person's past, how much trouble they have been into.

\* \* \*

Q. *** Is there anything in someone's background that you would look to in the decision that the death penalty should not be given?

A. None that I know of.

Q. None whatsoever. You can think of no factor in a person's background that would convince you that a death penalty should not be given?

A. No.

Q. No matter what kind of life they have led. That would not come into play in any way whatsoever in your determination as to whether or not you would give the death penalty?

A. No.

Q. So you have only to look to a person's background in deciding to go ahead and give the death penalty but not in deciding not to give the death penalty?

A. Right."

On the basis of these answers defense counsel then asked that the venireman be excused for cause.

In response the circuit court addressed the venireman, essentially explaining the nature of evidence in mitigation and in aggravation as well as the need for a juror to weigh "each piece of evidence" offered by both the State and the defendant. In so doing, the court explained to the venireman that

> "the jury does not just take the act itself of the killing to consider whether [the defendant] should receive the death punishment. They also must consider what kind of a young man he has been, the kind of home that he has had. Things that might have contributed to his being of a frame of mind to permit the killing. That's mitigation."

Thereafter, in answer to a number of questions by the court, the venireman indicated unequivocally that he could vote either to impose the death penalty or not to do so, depending upon "[t]he evidence and the law." Defense counsel subsequently questioned the venireman further at length, eliciting answers entirely consistent with those just given to the court. At the conclusion of defense counsel's questioning of him, however, the following colloquy between the venireman, defense counsel, and the court ensued:

> "[Defense counsel]: Mr. Rendleman, if your son was sitting here right now picking a jury to decide whether he would live or die, do you feel he would receive a fair trial from someone thinking the way you're thinking as you sit there right now?
>
> A. Yes, he probably would.
>
> Q. Probably. Would you pick one as predisposed as you are right now to the death penalty to sit on that jury?
>
> A. Yes, I probably would.
>
> Q. And you feel you would be able to totally put aside

any opinion you have right now, totally get rid of that opinion and make your decision only on the facts and circumstances that are presented in this courtroom and arguments that [the State's Attorney] and myself will make to you?

A. Yes.

Q. You feel you can be totally fair; is that correct?

A. Yes.

Q. Even though you have formed an opinion at this time already?

A. Yes, sir.

[Defense counsel]: We are—we show a continuing motion for cause.

THE COURT: You are going to vote the death penalty or no death penalty depending on the law and the evidence, one way or the other?

MR. RENDALMAN [*sic*]: Yes.

THE COURT: It will be overruled."

The standard for determining whether a venireperson in a capital case ought to be excluded for cause as a consequence of his views concerning capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526; *People v. Holman* (1989), 132 Ill. 2d 128, 143.) In reviewing a circuit court's decision whether to excuse a venireperson for cause, it is necessary to consider the venireperson's statements as a whole and not in isolation (*Holman*, 132 Ill. 2d at 144; *People v. Gaines* (1981), 88 Ill. 2d 342, 357) and to recognize that the circuit court is in a superior position to ascertain the meaning that a venireperson intends to convey where there are inconsistencies in the answers he or she has given (*Holman*, 132 Ill. 2d at 148). The determination whether to allow a challenge for cause lies within the sound discretion of the circuit court (*Holman*, 132

Ill. 2d at 148) and will not be disturbed absent an abuse of that discretion.

Applying these principles, we conclude that venireman Rendleman's statements as a whole do not indicate that his views would prevent or substantially impair the performance of his duties as a juror in accord with his instructions and his oath. On numerous occasions during the thorough examination of him he indicated that he would make his decision based upon the law and the evidence. Plainly, the circuit court, in its superior position to assess the responses of the venireman, determined that he could be fair and impartial and would, in fact, make his decision upon the law and the evidence. We cannot say that the court abused its discretion in denying the defendant's challenge of this venireman for cause.

With respect to the venirewoman McAnally, during examination by the court she stated initially that she was "not sure" that she could vote in favor of the imposition of the death penalty. During extensive examination the venirewoman said further that, concerning the imposition of the death penalty, "at this time I probably lean more heavily towards saying no than I do yes"; that she "doubt[ed]" that she could sign her name to a verdict calling for the death sentence; that although she was "not one hundred percent clear in [her] mind" as to whether she could vote in favor of the imposition of the death sentence under certain circumstances, she had "a feeling when it came right down to it that [she] probably could not"; that "part of [her] strong conflict is a religious problem that [she has] about the death penalty and taking another life"; and that even though the evidence and the law indicated that the death penalty was warranted, because of her religious beliefs she probably could not sign her name to a verdict in favor of it.

Following the State's examination of the venire-

woman, the State's Attorney asked that she be excused for cause, whereupon the circuit court questioned her further as follows:

"Q. Are you saying that under no conditions would you ever vote for the death penalty because of your religion?

A. Yes, sir, it would be hard for me to do that because of—

Q. Are you saying you would never do it, then? Is that what you're saying?

A. Never is pretty strong, but yes, I lean toward—

Q. There's nothing wrong with expressing your views either way they are, yes or no. I mean, there's no criticism. It's just whether or not you are definite in your thinking.

A. I probably would always find it very difficult to do that.

Q. Well, are you saying you never would vote for the death penalty? Emphatically, automatically vote no for the death penalty?

A. I can can't [*sic*] honestly say no, I never would, but I have a feeling I probably wouldn't. I've never been put in that position where I've had to say yes or no."

In ruling on the State's request, the circuit court explained to the juror that he was excusing her for cause in view of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and *Wainwright* and because of her testimony "that [she is] not sure of [herself] and [her] religion would cause a problem in [her] handling [of her] vote on the death penalty."

A venireperson who expresses only general objections to the death penalty may not be excused for cause. (*Witherspoon*, 391 U.S. at 522, 20 L. Ed. 2d at 784-85, 88 S. Ct. at 1777; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 416.) As already stated, a venireperson's views concerning the death penalty warrant exclusion for cause only when they will prevent or substantially impair the performance of that person's duties as a juror in accord with his or her instructions and oath. (*Mahaffey*, 128 Ill. 2d at 416.) Also, as previously stated, a venireperson's

remarks must be considered not in isolation but as a whole. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 386.) Further, it must be clear that the venireperson is willing to set aside his or her own beliefs in favor of the rule of law. (*People v. Williams* (1994), 161 Ill. 2d 1, 54.) It is axiomatic that a great deal of deference must be given to the circuit court, which is in a superior position to determine not only from a venireperson's responses as a whole but also from a venireperson's demeanor whether that person's views toward capital punishment would substantially prevent or impair the venireperson's performance of his or her duties as a juror in accord with the oath a juror is required to take. *Williams*, 161 Ill. 2d at 54.

Although the venirewoman did not say that she could vote under no circumstance for the imposition of the death penalty, her responses reveal a strong likelihood that she would be unable to cast such a vote. Nor did she imply in any way that she would be willing to put aside her own beliefs temporarily in deference to the law (see *Williams*, 161 Ill. 2d at 55); indeed, her answers suggest that her religious views would predominate. As a whole her answers indicate that her religious views would have either prevented or substantially impaired her performance of her duties as a juror. As a consequence, the circuit court did not abuse its discretion in excusing her for cause.

As the second issue defendant raises for review, he asserts that the death sentence is excessive in view of his "severe psychiatric problems," citing "mitigation that he had learning disabilities, mental problems, was suicidal, spent most of his childhood in institutions, and came from an abusive dysfunctional family."

The defendant pled guilty to having murdered the victim, Kathy Woodhouse, by striking her twice in the head with a mop wringer while committing an ag-

gravated criminal sexual assault. During the first stage of the death penalty hearing, Kenneth Otey, a crime scene technician for the Illinois State Police, testified that the body of Kathy Woodhouse had been found naked except for a bra, lying face down on the floor near the furnace of Fox Dry Cleaners, where she worked. Her hair was matted with blood, there was blood running on the floor from the area of her head into the wall about a foot away from her body, and a mop wringer was lying on the floor against a wall about 15 feet away. During this stage of the death penalty hearing, Eric Frattini, an investigator and crime scene technician for the Williamson County sheriff's department, testified that the defendant had told him he had raped and killed Kathy Woodhouse shortly after 8 a.m. on January 18, 1992, while she was working as an attendant at the dry cleaning establishment located a short distance from defendant's home in Herrin. The witness described the defendant's attitude when he recounted his commission of the offense as "somewhat distant at times. At certain points he almost appeared to be proud of what he had done." The witness observed no expression of remorse or regret on defendant's part.

During the second stage of the death penalty hearing the State presented among other evidence in aggravation the testimony of two witnesses from Louisiana concerning a charge of attempted aggravated rape to which the defendant had pled guilty there. For this offense, which was committed when the defendant was 14 years old and to which he confessed, defendant was sentenced to "juvenile life." According to the first of these two witnesses, Jerry Gardiner, who is a lieutenant in the police department at Baton Rouge, such a sentence in Louisiana extends to a maximum age of 21. The defendant served this sentence at the Louisiana Training Institute, which is the secure placement for ju-

venile offenders sentenced to that State's department of corrections. At the time the offense was committed in August of 1985, this witness was a sergeant in charge of the sex crimes section of his department and was present when the defendant confessed, with no indication of remorse beyond a wish to spare his mother the embarrassment of hearing her son describe to the officer the details of his commission of the offense.

The other witness from Louisiana who testified was the victim of that crime, Sandra Lott, who was attending a conference for school administrators in a meeting facility at a hotel in Baton Rouge when the offense occurred. After lunch she had gone to the ladies' room. As she was drying her hands, the defendant seized her by the arm and swung her around, saying, "You're coming with me." At the time of the offense, the victim weighed 84 pounds and was unable to break the grip of her assailant, whom she described as "very angry." When she informed defendant that she was not going with him, he pulled out a butcher knife equipped with a blade of "[a]t least" five or six inches, put it "[r]ight in front of [her] face," and told her, "You are coming with me or I will kill you." Defendant took her to the last stall in the ladies' room, locked them both inside, and told her to take off all her clothes or he would kill her. She disrobed completely.

Defendant proceeded to examine her "private parts" digitally and attempted, without success, on approximately three occasions to penetrate her vagina with his penis, at all times threatening her with the knife. When another woman came into the ladies' room, defendant told Lott that if she uttered a word, he would kill her. Thereafter, while she was still naked, "he turned me around with my back to him and he had, like, one arm kind of around my neck and then he had the knife in the other hand, and he kept rubbing the knife up and

down my side." She testified concerning her extreme fear at that time arising out of her belief that defendant "was contemplating whether to stab [her] or not." However, shortly thereafter defendant told her to dress and asked her if she knew anyone there or whether anyone was outside waiting for her. When she advised him that she knew about 300 of the people there, he responded that if she saw anyone she knew, she was to "tell them that you have to go do something."

Defendant took Lott outside the building, still threatening to kill her if she said "a word." Behind it was a field of tall weeds, where he instructed her again to undress. She did so, "very, very afraid" he would kill her. When defendant told her, "I am going to put your clothes over here," picked up her clothes, and took a couple of steps, Lott fled "[b]ecause as much as I had been threatened, I really—I did not feel like he would let me go. I felt like he would kill me." Completely naked, she ran until she reached the end of the building, where she saw a man whom she asked for help. He obtained a coat for her and called police.

Two weeks later, on August 14, 1985, defendant was arrested for trespassing in the same ladies' room. At that time his involvement in the prior offense committed there came to light, and Lott identified him as the perpetrator.

Among the witnesses called by the State was Joe Woodhouse, the husband of the victim, who was 40 years old when she died. The three children of the couple were at the time of the hearing aged 12, 16, and 22.

Also called as a witness by the State was Lynda Schott, the defendant's first cousin. As this witness stated her name, the defendant interjected, "Bitch." She had visited the defendant, together with his mother and another woman, once while he was in jail following the murder of Kathy Woodhouse. Thereafter he had con-

tacted her by telephone and by letter. Although she thought she had made clear to him that she did not wish to receive telephone calls from him, he continued to call her, asking in the next to the last call whether she would want to go to bed with him. When she answered in the negative, he became angry.

Schott described as "[t]hreatening" the tone of the first of the letters she had received from him thereafter, while he was in jail for the instant offense. In this letter, which bore the defendant's name with the return address and was dated June 9, 1992, the defendant threatened to kill her and her family, as well as her husband's brother, who works as a guard at the Menard correctional facility. She and her husband have three young children. The witness contacted police about the letter. In it defendant referred to Kathy Woodhouse as "[t]he bitch." Thereafter the witness received another letter from the defendant, dated July 28, 1992, this time of apology. Still another letter from the defendant to her was apprehended by a guard before it was mailed. In the defendant's printing on the back of the envelope containing this third letter is the following: "Death to your family. Kiss it. Read this and enjoy." Above the signature on the letter itself is printed, "See you in hell."

Schott testified that she had heard the defendant say on the telephone that he wanted to be like Charles Manson, that Manson is his idol, and that defendant wanted people to follow him the way they did Manson. On cross-examination she stated that when the defendant lived in Louisiana, "he used to write in his letters all the time about Charles Manson and how much he loved him, and idolized him and wanted to be like him." In the third of defendant's letters to her, confiscated by authorities and read by her on the morning she testified, defendant mentioned Manson. The three letters

were read by the jury. The defendant called as a witness Dr. David Warshauer, a clinical psychologist who examined defendant on two occasions in May of 1992. He found the defendant to be suffering from alcohol abuse, depression, antisocial personality disorder, and schizo-typal personality disorder. Dr. Warshauer described a person with an antisocial personality disorder as one who violates the law fairly regularly and a person with a schizo-typal personality disorder as one who has "odities [*sic*] or eccentricities of thinking." Defendant indicated to him that he had heard "a man's voice speak with him occasionally" and referred to "something chewing in his brain, both of which I consider to be fairly odd or eccentric." Dr. Warshauer found the defendant both fit to stand trial and sane at the time the offense was committed. "Overall" he found that his analysis of the defendant coincided with the information he had reviewed in reports from the State of Louisiana. In his opinion the defendant would function in "normal" society "[n]ot very well" and would at times be very impulsive, use extremely poor judgment, and vent upon society repressed anger, of which he has "a lot."

During cross-examination Dr. Warshauer testified that a person with a schizo-typal personality disorder "still has a very good grasp of reality" and is able to attribute the voice to his imagination and to control it to some extent. Defendant admitted to Dr. Warschauer that the man's voice he had heard had spoken to him only a "couple" of times, saying, for example, "Don't go to court." In the materials from Louisiana, the witness said, the defendant indicated that his stepfather had abused him verbally but not physically.

While defendant was incarcerated in Louisiana, he was evaluated irregularly and received "fairly sporadic" and, in the view of the witness, inadequate treatment for his psychological problems. During part of the time

defendant was confined in Louisiana, he received medication and had weekly psychotherapy sessions, some of which were individualized, some of which consisted of group therapy. Defendant told him that he had used marijuana and "speed" and, at the age of 13, PCP and cocaine; that while incarcerated in Louisiana he was able to obtain drugs; and that after his release from the facility in Louisiana he had continued to use cocaine and PCP. The witness described a history from defendant's early teens of "[t]ruancy, vandalism, shoplifting, auto theft, threatening a boy with a knife."

Stating that defendant cannot function in "normal" society, Dr. Warshauer expressed the belief that defendant is "extremely dangerous" and the view that whereas imprisonment and the threat of a death penalty serve as major deterrents to most persons, they do not serve as deterrents to defendant. The defendant could be dangerous not only in "normal" society but also in prison, although he would be "much less likely to transgress" in prison because of the "extreme limits and structure" of such a setting. It is, he said, "probably true" that in many respects defendant lacks a conscience.

The defendant called as his other witness Steve Aschieris, a probation officer for adults in Williamson County, who prepared a presentencing report concerning the defendant and, in so doing, received numerous reports from the State of Louisiana, including various psychological reports and assessments, court records, and reports from that State's department of corrections. The earliest reports cover a three-month period in 1984 from April 1 through June 30, during which time defendant was living at the Boys' Village in Lake Charles, Louisiana, a group home related to the department of corrections, where he lived for approximately a year until June 29, 1985, when he was released, apparently

to his home, slightly over a month before he committed the offense of attempted aggravated rape on August 1, 1985. About 10 days before his release from the Boys' Village, defendant exhibited "exploding out behavior" with a house parent that caused concern about whether he was actually ready to be released from the program as previously scheduled by court order. As a consequence of his commission of the offense on August 1, 1985, he was confined in Louisiana's correctional facilities from the age of 14 until his release to the care and custody of his mother on December 24, 1991, less than a month before he committed the instant offense. On August 26, 1991, he ran away from the correctional facility and on October 20, 1991, returned voluntarily to Louisiana.

This witness testified that the defendant's parents separated when he was a year old and divorced when he was two. Later defendant's mother remarried. Of her remarriage, a presentence report from Louisiana states, according to the witness, " 'Paul said his problems started when Douglas Jackson married his mother and moved in. Indeed, the family seems to have suffered greatly when he became a part of it. Mr. Jackson is an alcoholic, is physically and emotionally abusive to Ms. Jackson and her sons.' " At the age of 10 the defendant began to miss school, to leave home, and to stay out all night, at which time he was placed in foster care.

While the defendant was living at the Boys' Village, he was assigned to the learning disabled classroom with some mainstreaming into regular classes. Later, while confined in juvenile facilities in Louisiana, defendant completed a GED and took courses in welding through Louisiana State University. During his confinement in Louisiana, the department of corrections moved him gradually from more to less secure settings and granted him furloughs. The witness testified about a report by

Dr. Harriet Williams on November 8, 1985, referring to defendant's having attempted suicide several times in the past and about another report by Dr. Alice Crawford on December 18, 1990, stating that the defendant seemed to have " 'sincere remorse for his offense.' "

Defendant argues that he should have been sentenced to an extended prison term rather than to death in view of the evidence presented in mitigation concerning mental illness, substance abuse, and child abuse. The decision made at the second stage of a death penalty hearing when factors in mitigation and in aggravation are considered is a process of balancing in which evidence in aggravation is measured against that in mitigation. (*People v. Johnson* (1991), 146 Ill. 2d 109, 145.) The decision of a capital sentencing jury will not be overturned lightly, particularly where that decision is amply supported by the record. *Johnson*, 146 Ill. 2d at 145.

Here the record is replete with evidence amply supporting the jury's decision that there are no mitigating factors sufficient to preclude the imposition of a sentence of death. (See *Johnson*, 146 Ill. 2d at 145 (death penalty appropriate despite mitigating evidence of mental illness and retardation, alcohol and drug abuse, and abuse as a child); *People v. Christiansen* (1987), 116 Ill. 2d 96, 129 (death penalty appropriate despite mitigating evidence of emotional and mental disturbance, alcoholism, drug addiction, poor health, deprived childhood, and remorse); *People v. Montgomery* (1986), 112 Ill. 2d 517, 533 (death penalty appropriate despite mitigating evidence of a troubled youth, an alcoholic mother, an abusive and drug-addicted father, heavy drinking, an antisocial personality disorder, and an extreme mental or emotional disturbance).) Slightly over one month after his release from a juvenile detention center and at the age of only 14 the defendant attacked a randomly

chosen woman sexually, threatening so persuasively to kill her with a butcher knife that she fled stark naked from him in the direction of approximately 300 professional acquaintances. Two weeks later he was apprehended upon his return to the same ladies' room where he had attacked and terrorized that victim. Less than one month after his release following more than six years of incarceration for that offense he attacked another woman sexually, brutally murdering her. While awaiting trial for the murder of this victim, whom he referred to in writing after the murder as "[t]he bitch," he threatened to kill still another woman, who had rebuffed his sexual advances, as well as her entire family, which included three young children. Certainly we cannot say on the basis of this record that the jury was required to find that the evidence in mitigation precluded the imposition of a death sentence. Under these circumstances we will not disturb the jury's decision.

As the third issue defendant presents for review, he maintains he received ineffective assistance of counsel when counsel failed to seek to suppress evidence that, defendant claims, was improperly admitted in aggravation because it was obtained through the use of an electronic eavesdropping device while he was incarcerated and awaiting trial for this offense. Defendant objects to part of the testimony of two jail guards, Hope Crider and Julie Sowman, concerning his statements to another inmate.

During the second stage of the sentencing hearing, Crider, a jailor at the Williamson County jail, testified that at about 3 a.m. on June 2, 1992, while the defendant was incarcerated in an isolation cell upstairs in the jail and she was monitoring in central control by means of a voice monitor outside the cell, she overheard the defendant speaking with a prisoner in the next cell. Following the suicide of an inmate in isolation about a

year before the hearing in this case, she said, jail personnel listen "constantly" to the monitors of the isolation cells, and monitoring the isolation cells in this way is official jail policy. She overheard the inmate in the adjoining cell ask defendant

> "what he was in for, and then he asked him—he told him what his charges were. And he asked him why he did it. And at that time, [defendant] went on to elaborate just about the whole situation with what he did, that he went to the cleaners. He said that it was approximately 8:00 a.m. He laid out the whole set up of Fox Laundry, about the—telling him about the bay doors. And then he went in the front door. He was surprised. He said that the attendant at the Fina Gas Station which is directly next to it didn't see him go in. He made comments about Ms. Woodhouse and her appearance and how her jeans were like a second skin and that he had to have her. He then went on to state that the shirt she had on was quite revealing in that it made her nipples appear hard, and it was just really a turn on to him. And he stated that he wanted her, that he had to have her. And once he had her, he didn't want her anymore so he murdered her."

Asked whether during this conversation the defendant expressed any regret about anything concerning the incident, the witness answered, "Yes, sir, he did. He stated that he regretted that at that time he wasn't wearing gloves." Asked whether defendant expressed any other regrets or made any expressions of remorse, the witness responded, "No. He was clearly bragging about the whole incident."

Defendant does not, however, dispute the admissibility of the further testimony of Crider that she had had numerous conversations with the defendant during his incarceration following the murder and that he "brags on occasion about how packed the courtrooms are when he is in." Nor does he object to her testimony that she had never heard him express any remorse or regret for the sexual attack and murder of Kathy Woodhouse.

Sowman, another correctional officer at the jail, testified to having overheard this same conversation, in which the defendant told the inmate

"how he had saw [*sic*] this girl at Fox Laundry and how he had wanted her. And he went on to tell [the other inmate] how the laundry mat [*sic*] was set up. Later he just said basically he wanted her. And after he had her, that he just killed her. He didn't want her anymore."

Asked about the defendant's attitude as he was saying these things, the witness described it as "more of a brag type."

Defendant does not object to Sowman's further testimony that during his incarceration she had had almost daily contact with him, at times inquiring about his next court date, and that "[m]any times he would respond that he didn't know, but he would hear it on the news. *** [H]e would say that the courtroom was filled, standing room only and stuff." Nor does he complain about Sowman's testimony that he had never expressed to her any sorrow about what he had done.

Likewise, defendant does not dispute the admissibility of any of the testimony of Jerry Hickey, another correctional officer, who stated that the defendant had asked him after jail personnel had moved his neighboring inmate later on June 2, 1992, whether the inmate's being moved

"had anything to do with what he told him the night before. I told [defendant] no. The reason we moved [the inmate] was purely administrative reasons and what [defendant] said had nothing to do with why we moved him. But if he didn't want anything repeated, he best not be talking while he is in jail. At that time [defendant] told me, he said, 'Well, it won't matter. They have got enough evidence on me now that they're going to convict me. I killed her. That's all there is to it.'"

Asked about the defendant's attitude when he said that, Hickey answered, "Nonchalant, just like anybody else would be talking about anything." Asked whether he

had ever heard defendant express remorse or regret, the witness responded, "None whatsoever."

A defendant who claims that he has received ineffective assistance of counsel must establish that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) A reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiency; if it is easier to dispose of a claim of ineffectiveness of counsel on the ground of lack of sufficient prejudice to the defendant, that course should be followed. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Edgeston* (1993), 157 Ill. 2d 201, 243; *Albanese*, 104 Ill. 2d at 527.) Defendant maintains that the State was able to overcome the "substantial mitigation presented to the jury" by using this testimony. We disagree. Although the picture of defendant presented by the testimony of Crider and Sowman is not flattering, it does not differ effectively from the one created by the other evidence in aggravation. We conclude that in light of the nature and the amount of the other evidence presented in aggravation defendant has failed to establish a reasonable probability that but for counsel's error the result of his sentencing hearing would have been different. As a consequence, we need not address the question whether the disputed evidence was improperly admitted.

As his fourth assignment of error, defendant contends, on the basis of a study conducted by Professor Hans Zeisel and found persuasive in *United States ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705, that the pattern jury instructions used in this case confuse

and mislead jurors in a manner requiring that his death sentence be vacated. We have rejected this same argument on a number of occasions (*People v. Williams* (1994), 161 Ill. 2d 1, 59; *People v. Kokoraleis* (1994), 159 Ill. 2d 325, 333-34; *People v. Kitchen* (1994), 159 Ill. 2d 1, 47), pointing out each time that the district court's ruling with regard to this study was reversed upon review in *Free v. Peters* (7th Cir. 1993), 12 F.3d 700, in which the majority found Professor Zeisel's study fatally flawed. Each time we have registered our agreement with the reasoning of the majority upon appeal in *Free v. Peters* concerning that issue, and we reiterate it here.

As his fifth contention of error, defendant urges that the jurors' deliberations were tainted by their having read, as they deliberated, a copy of a slip opinion of *United States ex rel. Free v. McGinnis* (N.D. Ill. 1992), 818 F. Supp. 1098, which had been included inadvertently among the materials given to the jury when it retired at 11:11 a.m. Defense counsel had earlier used a copy of the slip opinion for purposes of argument to the court during the conference on jury instructions, conducted out of the presence of the jury. In the opinion, which examines the studies of Professor Zeisel at considerable length, the magistrate judge reports that the Illinois death penalty statute, as implemented through jury instructions, permits the arbitrary and unguided imposition of the death sentence.

At approximately 2:30 p.m. the fact that the slip opinion had been included among the materials given to the jury came to the attention of the court and counsel, who stipulated that it should be withdrawn from the jury. Upon the court's request, all the jurors returned to the courtroom, and the foreman returned to the court the copy of the slip opinion. Having advised the assembled jurors that the material in question had been offered by defense counsel during the conference on jury

instructions, the court ascertained that, according to the parenthetical material noted in the transcript of proceedings, "[m]ost of the jurors" had read the 54-page document. Thereafter the court instructed the jurors at length not to consider the opinion in any way whatsoever in their deliberations. Once again the jury retired to deliberate, and at 5:20 p.m. it announced that it had reached its decision.

Defendant argues that "[t]here is a reasonable possibility" that the jury's decision was affected in several ways by the jurors' reading of the slip opinion. He suggests, *inter alia*, that because of the nature of the material discussed therein, the jurors were less inclined to rely upon and to follow the instructions just given them; that the jurors "could reason" that a court of review, not the sentencing jury, bears the responsibility for determining the appropriateness of a death sentence; and that because James Free in the opinion at issue had committed murder and attempted rape and had been sentenced to death, "the present jury likely felt that similar crimes should result in the same punishment."

Certainly it is error to permit the jury to take into the jury room during deliberations matter that was not admitted into evidence. (*Gertz v. Bass* (1965), 59 Ill. App. 2d 180, 183.) Here, however, the circuit court instructed the jury with great care that it was to ignore completely and to consider not at all the slip opinion it had mistakenly been given. The jury is presumed to follow the instructions that the court gives it. (*People v. Fields* (1990), 135 Ill. 2d 18, 53.) Thus, the error should have been cured by the circuit court's careful instructions to the jury to disregard this material entirely. (See *People v. Coleman* (1994), 158 Ill. 2d 319, 343.) Moreover, we have read the entire record on review, including the copy of the slip opinion given to the jury, and conclude that even if the error were not cured, either in whole or

in part, by the court's instructions to the jury, in light of the nature and the extent of the evidence in aggravation against the defendant, the error was, at most, harmless beyond a reasonable doubt.

As his penultimate contention of error, defendant challenges the constitutionality of the death penalty statute in Illinois for violating the eighth and fourteenth amendments because it places on the defendant a burden of proof that precludes meaningful consideration of evidence in mitigation. This court rejected such a claim in *People v. Hampton* (1992), 149 Ill. 2d 71, 117, in which the defendant advanced unsuccessfully the same arguments that the defendant relies upon here. Inasmuch as defendant offers no reason to reconsider them, we decline to do so.

In a companion argument defendant maintains, in reliance upon *Stringer v. Black* (1992), 503 U.S. 222, 235-36, 117 L. Ed. 2d 367, 382, 112 S. Ct. 1130, 1139, that the death penalty statute violates the eighth and fourteenth amendments for the further reason that it allows the sentencer, during the second stage of a death penalty hearing, to weigh a "vague" factor in aggravation, namely, "[a]ny other reason" (Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992)) supported by the evidence, in addition to any statutory aggravating factor or factors found by the jury at the first stage of such a hearing. However, on numerous occasions this court has rejected the argument that a sentencer's consideration of nonstatutory factors in aggravation during the second stage of a death penalty hearing permits the arbitrary imposition of a death sentence. (*People v. Todd* (1992), 154 Ill. 2d 57, 75-76; *People v. Neal* (1985), 111 Ill. 2d 180, 203; *People v. Madej* (1985), 106 Ill. 2d 201, 211; *People v. Collins* (1985), 106 Ill. 2d 237, 285.) Defendant offers no reason for this court to depart from its prior holdings concerning this issue, and we see no reason to do so.

Finally, defendant challenges the constitutionality of the Illinois death penalty statute for violating the eighth and fourteenth amendments because it fails to minimize sufficiently the risk of an arbitrarily or capriciously imposed sentence of death. He acknowledges that this court has already addressed several arguments in this regard but asks us both to reconsider them and to consider whether in their totality the features and omissions he identifies render the statute unconstitutional. However, the defendant urges a reexamination of the prior holdings of this court without offering any reason therefor. Hence, we will not undertake such a review. Furthermore, this court has, likewise, rejected the position defendant takes with respect to the cumulative effect of these features and omissions (*People v. Phillips* (1989), 127 Ill. 2d 499, 542-43), and we decline to reconsider it.

Therefore, for the reasons stated above, the judgment of the circuit court of Williamson County is affirmed. We hereby direct the clerk of this court to enter an order setting Wednesday, November 22, 1995, as the date on which the sentence of death entered by the circuit court of Williamson County is to be carried out. The defendant shall be executed in a manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*