2020 IL App (1st) 180006

SIXTH DIVISION
September 4, 2020

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-18-0006

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 11239 |
| | ) | |
| TRAVIS CAGUANA, | ) | Honorable |
| | ) | Arthur F. Hill, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Cunningham and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1     Travis Caguana was convicted by a jury of first degree murder and aggravated battery with a firearm. The trial court sentenced Travis, who was 17 years old at the time of his offenses, to an aggregate term of 66 years in prison. During the course of Travis's trial, two members of the jury learned outside of court that his father, Euripides Caguana, had tried to have two of the State's key witnesses killed so that they would be unable to testify in Travis's case. Travis now seeks a new trial, on the basis that this information gave rise to a presumption of prejudice that the State failed to establish was harmless. In the alternative, Travis asks to be resentenced, arguing that the sentencing judge did not follow our supreme court's guidance in *People v. Holman*, 2017 IL 120655, regarding what a court imposing a *de facto* life sentence on a juvenile must do to comply with the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012).

¶ 2    For the reasons that follow, we agree that a new trial is warranted. Although we commend the trial judge for taking the allegations of jurors' exposure to outside information seriously and conducting a thorough hearing into what the jurors learned and how they learned it, we believe the judge did not allow himself to fully appreciate the impact that such information was likely to have on a reasonable juror's verdict. In light of our holding, we do not address Travis's sentencing challenges.

¶ 3                                I. BACKGROUND

¶ 4                    A. *Voir Dire* and the Court's Initial Cautionary Instructions

¶ 5    A one-week jury trial was held in this case in March 2017. Pretrial motions and *voir dire* took all of the first day. Potential jurors were asked if they had heard about an unrelated shooting that occurred near the courthouse earlier that morning and several had. Sheila Jefferson, for example, had heard about it on a television news program in the jury room. David Rivers, who heard someone discussing the shooting at lunch, stated that he had "looked it up on [his] phone" and recited for the judge a number of details about the incident. Ms. Jefferson and Mr. Rivers both indicated, however, that the incident would not affect their ability to decide Travis's case fairly, and both were selected as jurors.

¶ 6    It was not until the following morning, before opening arguments, that the jury was given the following cautionary instruction:

        "Members of the jury, the trial is about to commence and I now will instruct you as to the law regarding some of your duties during trial and deliberations. You should not do any independent investigation or research on any subject or person relating to the case. What you may have seen or heard outside the courtroom is not evidence. This includes any press, radio or television programs and it also includes any information available on the

internet. Such programs, reports and information are not evidence, and your verdict must not be influenced in any way by such material.

For example, you must not use the internet or any other sources to search for any information about the case or the law that applies to the case. During the trial, during the course of the trial do not communicate with, provide information personally or in writing or electronically to anyone about this case. Not even your own families or friends, courtroom personnel and also not even among yourselves until instructed otherwise."

The jurors were not asked if they had already received any outside information relating to the case, and no juror volunteered such information.

¶ 7                                 B. Travis's Trial

¶ 8     This case involved a gang-related drive-by shooting. The sufficiency of the evidence to support the jury's verdict is not at issue. The following overview of that evidence is provided as context for Travis's claim that the outside information Ms. Jefferson and Mr. Rivers learned was prejudicial and may have influenced their findings of guilt.

¶ 9     In the late afternoon of June 8, 2011, two brothers—Larry and Courtney Holmes—were returning on foot to their home at 3459 West 79th Street in Chicago. The two were accompanied by their friends, Donte Smallwood and Donta Mosley, and the group was unarmed. Shots were fired from a nearby vehicle as the group crossed the street and approached the residence. The Holmes brothers ducked and took cover in a gangway, but Mr. Smallwood was killed and Mr. Mosley was injured. Inside the vehicle from which the shots were fired were 19-year-old Ricardo Rios, 18-year-old Michael Sierra, and 17-year-old Travis Caguana. Officers investigating the shooting soon focused their efforts on the pair of houses where Travis and Mr. Sierra lived as next-door neighbors. The night of the shooting, Mr. Sierra was observed walking out of his house with

a gun that he gave to his girlfriend and that was later identified as the murder weapon. Both Mr. Sierra and Travis, who was seen removing a different weapon from his parent's house, were arrested and charged with unlawful gun possession. Two days later, Mr. Rios named Travis as the shooter in the earlier drive-by shooting. Four days after that, Mr. Sierra also named Travis as the shooter.

¶ 10    According to the testimony of Mr. Rios and Mr. Sierra, they, along with Travis, were members of the Latins Out of Control (LOC) gang. On the day of the shooting, they were driving around in Mr. Rios's mother's vehicle, a green Kia Sportage, and had a verbal confrontation with a group of three or four individuals who were members of a rival gang known as Money Over Bitches (MOB). No guns were displayed, and the group drove on. Later the same day, Mr. Rios was again driving—with Mr. Sierra in the rear passenger seat and Travis in the front passenger seat—when they came upon a group of individuals crossing the street who they suspected might also be MOB members. Mr. Rios and Mr. Sierra testified that they suddenly heard a gunshot and ducked. They looked up to see Travis holding a gun and watched as he fired a second shot out of the vehicle's window at the group crossing the street. Neither Mr. Rios nor Mr. Sierra had seen Travis with a gun before the shooting. Following the shooting, the three had an argument, and Mr. Rios dropped Travis and Mr. Sierra off before returning to his own home. Mr. Sierra testified that he reluctantly took the murder weapon from Travis and agreed to hide it beneath a window air conditioner in back of his house.

¶ 11    Mr. Rios and Mr. Sierra were never charged in connection with shooting. Mr. Rios stated that he was not promised anything in exchange for his testimony but acknowledged that he had been questioned by the police, detained overnight, and threatened with murder charges if he did not cooperate in their investigation. Mr. Sierra explained that he had agreed to testify at Travis's

trial in exchange for probation on a charge of aggravated unlawful use of a weapon. Mr. Sierra noted, however, that he had a pending charge for driving under the influence that, as a violation of his probation, could mean that the State was no longer bound by that plea agreement. Mr. Sierra further testified that five months before the trial commenced, he had requested and received the State's assistance to relocate within the City of Chicago, with the State paying his moving expenses, first month's rent, and security deposit.

¶ 12    Beyond the testimony of these two individuals, the State's case largely consisted of officer testimony regarding the surveillance of the suspects' homes and forensic evidence linking the weapon Mr. Sierra gave to his girlfriend to the shooting. No fingerprints were found on the murder weapon. The Kia Sportage Mr. Rios was driving on the night of the shooting tested positive for gunshot residue on the driver-side door and inconclusive with respect to the passenger-side door. The State's expert testified that if—as Mr. Rios and Mr. Sierra maintained—Travis had fired the gun with his hand outside the front passenger-side window, gunshot residue may or may not have settled on the passenger-side door. The expert testified that it was also possible for residue to have blown back and settled on the driver-side door without ever settling on the passenger-side door.

¶ 13    The jury found Travis guilty of the first degree murder of Donte Smallwood, the aggravated battery with a firearm of Donta Mosley, and aggravated discharge of a firearm in the directions of Larry and Courtney Holmes.

¶ 14                    C. Exposure of Two Jurors to Outside Information

¶ 15    In a motion for a new trial filed on March 31, 2017, Travis argued that his rights to due process and to confront witnesses against him were violated when two jurors improperly learned that Travis's father Euripides had tried to have two of the witnesses in this case killed. Attached to the motion was the affidavit of juror Ellen Mulvey, who contacted defense counsel on the

Monday following the jury's verdict to report a conversation she had overheard in the jury room. Ms. Mulvey averred that "[a]fter the verdict forms were signed, but before [they] were published in Court, a female juror, Sheila, said she had 'looked up this case' and had learned that the Defendant's father had tried to hire people to kill witnesses in the case." According to Ms. Mulvey, upon hearing this, the jury foreman had remarked " 'I saw that too.' " Ms. Mulvey stated, "I was concerned because the judge had told us not to try to investigate the case on our own."

¶ 16   The motion was briefed, and the trial judge held an evidentiary hearing to receive testimony from the jurors Ms. Mulvey had identified. Jury foreman David Rivers testified that he had looked up an article about the case on the Internet. Although he could not remember the name of the newspaper, when shown a Chicago Tribune article titled "Dad guilty in plot to kill witnesses," he said, "It looks like the same information I read."

¶ 17   That article, which was entered into evidence, stated that a federal jury had convicted Euripides Caguana on four counts of using interstate commerce to facilitate the murders "of two witnesses slated to testify at his son's murder trial." The article further reported that Euripides's son Travis "was about to go on trial in the June 2011 gang-related murder of Dante Smallwood," when Euripides called an individual who turned out to be a police informant and "asked for a meeting to discuss having the witnesses in his son's case killed before they could testify." According to the article, Euripides offered to buy the informant a gun, agreed to pay up to $7,000 for the murders, and met with the informant several times to point out the witnesses and even specify the order in which they should be killed.

¶ 18   Mr. Rivers stated that he did not mention or share any information from the article he read with any of his fellow jurors during trial or deliberations but that, after the verdict was read in open court and the jurors returned to the jury room, he did discuss it with another juror who brought up

the subject.

¶ 19    Ms. Jefferson testified that on the day the jury was chosen, she had spoken to a friend of hers about the case. Ms. Jefferson said the friend "asked me what was I doing that day or something and I told her I had just got picked for jury duty on a trial and I said the name." Ms. Jefferson said she could not recall exactly what her friend said in response but that "it was, like, a contract—a murder to hire thing" or "something like that." Ms. Jefferson denied doing any independent research into the matter. She also claimed that she had not immediately associated the story her friend told her with Travis's case but that when "someone got up on the stand and you all said he was in witness protection," it occurred to her that the two things "had something to do with each other."

¶ 20    Neither Mr. Rivers nor Ms. Jefferson mentioned to the deputy at any time during trial or deliberations that they had learned outside information relating to the case. They both agreed that the murder-for-hire plot was not raised in the jury room until after the verdicts were signed and read out in open court.

¶ 21    In lieu of her live testimony, Ms. Mulvey's affidavit was admitted as evidence.

¶ 22    During argument on the motion, both sides addressed what they believed a juror could have inferred from the outside information about Euripides's conduct and resulting conviction. Defense counsel worried that a juror may have inferred that Travis knew of the plot and had asked his father to kill the witnesses or concluded that Travis's own father believed he was guilty. The State countered that it was also possible for the jurors to have inferred that Euripides believed his son was innocent and did not want him to be convicted of a crime he did not commit. The prosecutor closed by stating:

    "The sins of the father cannot be considered the sins of the son. In no way can we show the

nexus or connection between the two of them; no phone calls, no accommodation. Nothing in that article indicates the son was part of this plot, this grand scheme of the father."

¶ 23   Before ruling on the motion, the trial judge made clear that he was troubled by the facts that had come to light and took the matter very seriously:

"Obviously this is an issue that is of great importance to all the parties here, not just to the Court but to defense counsel, the defendant, the state, and the witnesses, as well as the victim's family.

I don't think there is any judge alive who would be happy upon hearing that one or some of the jurors that were selected to hear a case got outside information not authorized by the Court. That is one of the most bone-chilling feelings that a judge can have. It is a serious issue. It is a crucial issue and it demands strict scrutiny when it comes to figuring out what to do about it."

¶ 24   The judge then described the inquiry that he believed was required:

"Our case law gives us some guidance as it relates to how to proceed. *** Certainly the method or process of the jury's deliberative process is off limits but if there's outside information, that should be looked at. ***

* * *

It is clear that, even in the best case scenario for the defense, the allegations about juror misconduct relate to the defendant's father on its face and not against this defendant. Neither by the statements that are attributed to the jurors, either by Ms. Mulvey's affidavit or the actual testimony of Mr. Jefferson—Ms. Jefferson and Mr. Rivers, is there an indication that the outside information was directly [related] to defendant or defendant's actions or the defendant's mind-set. Clearly the implication relates to the defendant's father

and his actions and/or his conviction.

Any outside information, from a juror's standpoint, not all outside information is equal.

In *McGee [v.] City of Chicago*, [2012 IL App (1st) 111084], during the course of the trial a clear issue that was going to be important for the jurors to decide were issues about memory loss or memory lapses. In that case a juror researched memory lapses and shared that with other jurors. That is something that constitutes outside information that had a direct impact on the issues that were going to be before that jury. That's not what we have here. We are prohibited, and I think rightly so by case law, from getting into the mindset of the jurors in terms of their deliberative process."

¶ 25 The judge expressed regret over what had happened and his intention, in future trials, to perhaps give the general cautionary instructions immediately after jury selection. Ultimately, though, he denied the motion. In the judge's view, the information, which did not concern anything that Travis himself said or did, would not help the jury decide whether Travis was the shooter in this case. And because there was no evidence that Travis knew of or participated in his father's plot to kill witnesses against him, the mere existence of that plot did not reveal a consciousness of guilt on Travis's part.

¶ 26 Following a hearing, Travis was sentenced to an aggregate term of 66 years in prison.

¶ 27                                          II. JURISDICTION

¶ 28 Travis was sentenced on December 5, 2017, and timely filed his notice of appeal the same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 29                               III. ANALYSIS

¶ 30    Travis argues that he is entitled to a new trial because two of the jurors in his case were exposed to prejudicial outside information. As he concedes: "A jury verdict will be set aside as a result of outside influences or communications only if the defendant was prejudiced as a result of the improper communication or outside influence." *People v. Hobley*, 182 Ill. 2d 404, 458 (1998).

¶ 31    As a general rule, the determination of prejudice "rests in the sound judicial discretion of the court after it has considered all the facts and circumstances." *Thornton v. Garcini*, 364 Ill. App. 3d 612, 617 (2006). However, an exception to this general rule of deference applies, "where a trial court's exercise of discretion has been frustrated by an erroneous rule of law." (Internal quotation marks omitted.) *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Where that is the case, our review is *de novo*. *Id.* The abuse of discretion standard includes review to determine that the discretion was not "guided by erroneous legal conclusions." *Koon v. United States*, 518 U.S. 81, 100 (1996).

¶ 32    While the trial judge fully appreciated that he could not inquire into the thought process of the two jurors before him, his analysis demonstrates that he may have further believed he could not properly consider, in even an abstract way, what the *likely* effect of the information on a reasonable juror's thought process may have been. We believe this prevented the court from fully considering the potential prejudicial effect of the information. When a trial court has unnecessarily constrained its own analysis—even where it has done so in an understandable spirit of caution and with the goal of hewing to a well-established rule—our deference must give way.

¶ 33    The inquiry into whether a defendant suffered prejudice as a result of outside information reaching a juror is a uniquely delicate one. To protect the "frankness and freedom of discussion and conference" on which jury deliberations depend, it has long been the rule that jurors may not be questioned regarding the "motive, method or process by which the jury reached its verdict."

(Internal quotation marks omitted.) *People. v. Williams*, 209 Ill. 2d 227, 239 (2004). As a result, "the inquiry focuses on the relationship between the extraneous information and the issues at trial *in a rather abstract sense*." (Emphasis added.) *People v. Collins*, 351 Ill. App. 3d 175, 180 (2004). Because the trial court cannot inquire into a juror's thought process, it must decide—based only on the content of the extraneous information and its relation to the issues in the case—whether the juror's exposure to the information resulted in "such a probability" of prejudicing the complaining party that the proceedings should be deemed "inherently lacking in due process." (Internal quotation marks omitted.) *Hobley*, 182 Ill. 2d at 458.

¶ 34     If a party makes a showing that potentially prejudicial outside evidence did reach the jury, the burden then shifts to the other party—here, the State—to establish that the exposure was harmless. *Id.* "[A] verdict may stand only if it is obvious that no prejudice resulted from the communication." (Internal quotation marks omitted.) *Id.* at 462.

¶ 35     It is clear to us that the jurors' exposure to this murder-for-hire plot resulted in such a probability of prejudice that Travis was denied due process. This was highly charged information. The perpetrator of the murder-for-hire plot was not a random acquaintance or a fellow gang member but *defendant's own father*. From the arresting officer's testimony, the jury understood that at the time of the shooting and his subsequent arrest, Travis was a 17-year-old boy living in his father's home. And according to news coverage that Mr. Rivers, at least, was exposed to, Euripides was not merely under investigation for potential wrongdoing. He had not made some sort of vague threats against the witnesses in question. He had been tried and convicted of multiple counts of solicitation to commit murder. The facts were sensational enough that, based only on their shared name, a friend of Ms. Jefferson's recalled them and immediately connected them to Travis's trial.

¶ 36    There are a number of ways in which, based on the content of this information and its relation to the issues in this case, we may conclude that the jurors' exposure to it prejudiced Travis. If the jurors thought that Travis's own father believed his teenage son was guilty, that alone would have been highly prejudicial. See *People v. Davis*, 130 Ill. App. 3d 41, 53 (1984) (holding that certain hearsay testimony was inadmissible where "the only conceivable purpose" for eliciting it was "to raise the highly prejudicial inference that the defendant's own mother believed him to be guilty of the crimes charged"). Moreover, the jurors certainly could have believed, even without any evidence, that Travis had asked his father to solicit someone to kill the witnesses or knew and approved of the plot. The credibility of the State's two identification witnesses, Mr. Rios and Mr. Sierra, was also pivotal to the State's case. If the jurors had any doubt as to whether these two men were telling the truth, knowledge that someone had been willing to kill them to keep them quiet and the witnesses were still willing to testify could very well have bolstered their credibility. As our supreme court held in *People v. Holmes*, 69 Ill. 2d 507, 519 (1978), although not every instance of extraneous information reaching a juror will require reversal, where that information "was in the nature of evidence crucial to the question of the defendant's identification with which he had neither been confronted at trial nor had the opportunity to refute," the exposure was prejudicial, and reversal is required.

¶ 37    From his remarks on the record, the trial judge in this case seems to have stopped short of considering these avenues for prejudice because he believed, in his words, that he was "prohibited, and I think rightly so by case law, from getting into the mind-set of the jurors in terms of their deliberative process." But there is a distinction between probing the *actual* thought process of jurors and considering the *likely* thought process of a hypothetical juror faced with potentially prejudicial information. The former is forbidden. The latter is imperative if the court is to

12

determine, as it must in these situations, whether a juror's exposure to certain information resulted in "such a probability" of prejudice that the proceedings should be deemed "inherently lacking in due process." (Internal quotation marks omitted.) *Hobley*, 182 Ill. 2d at 458. As noted above, although we generally accord great deference to a trial court's conclusions regarding prejudice in such matters (*Thornton*, 364 Ill. App. 3d at 617), the determination by the trial court in this case appears to have been the result of a misapprehension of the appropriate inquiry.

¶ 38    In urging us to affirm, the State makes much of the fact that, contrary to Ms. Mulvey's affidavit, both Mr. Rivers and Ms. Jefferson testified that Euripides's murder-for-hire plot was never mentioned in the jury room until *after* the jury's verdicts were published and their service as jurors had ended. But a new trial is required even if only one juror was exposed to prejudicial outside information that may have affected that juror's verdict. *Collins*, 351 Ill. App. 3d at 181 (attaching "no significance" to the fact that a juror who conducted his own investigation into an issue in the case did not share that information with other jurors because he "was a juror, and his personal verdict was necessary to convict [the] defendant"). Mr. Rivers and Ms. Jefferson learned about the murder-for-hire plot on the evening following jury selection, before the first witness took the stand. If the deliberations of either of them was tainted, the verdict against Travis cannot stand. 75B Am. Jur. 2d *Trial* § 1338 (Aug. 2020 Update) ("A conviction cannot stand if even a single juror has been improperly influenced."); 23A C.J.S. *Criminal Procedure and Rights of Accused* § 2020, at 925 (2016) ("even one juror's prejudice due to exposure to extraneous information is sufficient to warrant a new trial in a criminal proceeding").

¶ 39    The State insists that because news coverage did not specifically name the targeted witnesses, there was no way for Mr. Rivers or Ms. Jefferson to have known, out of the 20 or so witnesses that the State called at trial, that it was Mr. Rios and Mr. Sierra whose lives had been

threatened. Mr. Rios and Mr. Sierra were the State's key witnesses and the only ones who identified Travis as the shooter. Any reasonable person would believe it likely that a murder-for-hire plot would involve those witnesses. The State's position is also rebutted by the connection that Ms. Jefferson testified she made during the trial between Euripides's plot and Mr. Sierra's relocation testimony, from which she apparently—and reasonably—inferred that Mr. Sierra was in a witness protection program.

¶ 40    At oral argument in this court, the State pointed out that neither juror could recall many details about the murder-for-hire plot and that Mr. Rivers in fact testified that the article he found online was "very vague," a "short article," with "[n]ot a lot of information." But the jurors testified a number of months after the trial in this case had concluded. It is unsurprising that they may not have remembered all the details of the information they were exposed to. When shown a copy of a news article—and one that was entered into evidence with no objection by the State—that contained a number of details regarding the plot, Mr. Rivers clearly stated, "It looks like the same information I read." The prosecutor himself described the article as one "that Mr. Rivers indicated may be the same one or very similar to the same one that he read." The article reported that Euripides had been convicted on four counts of using interstate commerce to facilitate the murders "of two witnesses slated to testify at his son's murder trial." It included details of both Travis's trial and his father's conviction. In short, we are unconvinced by the State's assertion that the two jurors were exposed only to a vague reference to Euripides's plot that likely made no lasting impression on them.

¶ 41    The State also emphasizes that "neither juror testified that they were influenced in any manner by their knowledge." The case law could not make clearer that this is an irrelevant—and indeed an improper—consideration. Our concern is and must be with the *probable* effect of

14

information on the jurors and not with the *actual* effect on the "motive, method or process" (internal quotation marks omitted) (*Williams*, 209 Ill. 2d at 239) by which they reached their verdicts. There is no testimony to this effect because asking the questions that would have elicited such testimony would have been improper.

¶ 42    At oral argument in this case, the State also argued that the rule forbidding inquiry into the jurors' actual thought process is a mere rule of evidence and that there was no objection when Mr. Rivers volunteered that the outside information "wasn't part of our deliberations." However, assuming that we can consider this evidence, we must do so in context. It is apparent that Mr. Rivers only meant that the outside information was never shared or discussed with other jurors as part of their discussions regarding the case. His statement tells us nothing about what effect the information may have had on Mr. Rivers's own deliberative process.

¶ 43    The State's position, which the trial judge seems to have adopted, is that the outside information could only have had a prejudicial effect if it related to Travis himself—if the jurors were informed that Travis knew of or participated in his father's murder-for-hire plot, which would constitute proof that Travis was conscious of his own guilt as the shooter in this case. But for the reasons discussed above, that is not the only way that a reasonable juror could have been prejudiced by learning of Euripides's conviction.

¶ 44    We conclude that Travis met his burden of demonstrating that the outside information two jurors in this case were exposed to related to issues in this case, such that there was a "probability" of prejudice to Travis. The burden then shifted to the State to demonstrate that any consideration of this evidence was harmless.

¶ 45    The State's argument for harmless error is that we must presume that jurors follow the instructions they are given (*People v. Taylor*, 166 Ill. 2d 414, 438 (1995)) and the jurors in this

15

case were instructed, after they were sworn in and after two of them had learned of Euripides's conviction, not to consider or be influenced by any outside information in arriving at their verdict. But this was a standard jury instruction. The State cites no case standing for the proposition that such an instruction, which is given routinely in jury trials, is sufficient to cure a juror's exposure to prejudicial information.

¶ 46    This case stands in contrast to cases where a party has successfully rebutted the presumption of prejudice and shown the improper information obtained by a juror was harmless. For example, in *Birch v. Township of Drummer*, 139 Ill. App. 3d 397, 409 (1985), a juror's unsanctioned visit to the scene of an accident, though improper, was found to have resulted in no prejudice where everyone agreed that the scene appeared much as it did in maps and photographs that had already been introduced into evidence. The State has made no similar showing here that these jurors learned nothing new when they heard or read about the murder-for-hire plot to kill the State's key witnesses.

¶ 47    We agree with Travis that the information the two jurors learned regarding his father's attempts to kill the State's identification witnesses likely appeared to those jurors to be "an overt attempt to influence the outcome of the trial in [Travis's] favor." Based on the probable impact that information would have had on a reasonable juror, a presumption of prejudice arose that cannot be viewed as harmless. A new trial is warranted.

¶ 48    Given this result, we need not address Travis's sentencing challenges.

¶ 49                                    IV. CONCLUSION

¶ 50    For the above reasons, we reverse Travis's convictions and remand this case for a new trial.

¶ 51    Reversed and remanded.

16

**No. 1-18-0006**

| | |
|---|---|
| **Cite as:** | *People v. Caguana*, 2020 IL App (1st) 180006 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-11239; the Hon. Arthur F. Hill Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Gavin J. Dow, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Clare Wesolik Connolly, and Sara Grurovic, Assistant State's Attorneys, of counsel), for the People. |