2021 IL App (1st) 192010-U

FIFTH DIVISION
JUNE 25, 2021

No. 1-19-2010

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 10589 |
| | ) | |
| JOHN LANEY, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The defendant's conviction for predatory criminal sexual assault of a child affirmed over his claims of ineffective assistance of counsel and insufficiency of the evidence.

¶ 2    The defendant-appellant John Laney appeals his conviction on five counts of predatory criminal sexual assault of a child, for which he was sentenced to a total of thirty years' imprisonment.  On appeal, the defendant argues that his trial counsel was ineffective for failing to: (1) successfully bar the State from introducing evidence of other crimes; (2) perfect impeachment of the victim; and (3) submit a written motion for a continuance to secure the appearance of a

witness. He further argues that the evidence was insufficient to sustain his conviction. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     In March 2016, eighteen-year-old C.M. reported to the police that the defendant regularly assaulted her during a four-year period between July 2003 and July 2007, when she was between the ages of six and nine years old. Following C.M.'s report, the defendant was charged by indictment with seven counts of predatory criminal sexual assault of a child against C.M.

¶ 5     Prior to trial, the defendant filed a motion to "quash arrest," to which the court responded that it did not recognize such a motion. The defendant clarified that he was moving to dismiss the charges as untimely. The court denied the defendant's motion to dismiss.

¶ 6     Also prior to trial, the State moved to admit evidence of other crimes involving the defendant's biological daughter. The State argued that the defendant had been accused of sexual assault against his biological daughter, A., when she was between the ages of 10 and 11. The indictment alleged that between March 2001 and June 2003, A. lived with her mother elsewhere, but had visitation with the defendant in Chicago. During one visit, A. was sleeping in the defendant's bed wearing underwear, no bra, and a large t-shirt. The defendant entered the room and massaged A.'s breasts under her shirt, telling her that this would make her breasts bigger. The court allowed the State to elicit this other crimes evidence, finding the probative value outweighed any prejudicial effect, given the factual similarity between the assaults on A. and C.M., and their proximity in time to each other.

¶ 7     A two-day trial commenced in January 2019. At trial, the State elected to proceed on counts 1-5 of the indictment, and the court dismissed counts 6 and 7.

¶ 8     C.M. was first to testify at trial. She testified that between the ages of 6 to 9 years old, she

primarily lived with her grandmother, but stayed with her mother on the weekends. At that time, her mother was living with the defendant in a high-rise apartment building on Lake Shore Drive in Chicago. Her mother worked late afternoons to late nights, and she remained in the defendant's care during the time her mother was working.

¶ 9 Two months after she met the defendant in 2003, and the first time the defendant baby-sat her, the defendant took her to a movie theater in the area of Western Avenue and Fullerton Avenue. While they were watching the movie, the defendant asked C.M. to sit on his lap. She complied. The defendant then slid his hands under C.M.'s pants and underwear and rubbed his hands on the outer lips of her vagina. C.M. asked what the defendant was doing, and he responded, "just playing." C.M. said she would tell her mother, but the defendant said that was not necessary because they were only "playing" and "joking." C.M. was confused and uncomfortable because her parents had told her no one was supposed to touch her in her "private area."

¶ 10 C.M. did not tell her mother what happened in the movie theater, and over the next three years, she continued to be in the defendant's care on weekends. During that time, the defendant touched C.M.'s vagina by rubbing his fingers in between her vaginal lips and feeling around her clitoris. He also performed oral sex on her. On one occasion, he laid C.M. down on her back on the couch and tried to put his penis inside her vagina. She told him he was too big and she was uncomfortable. He asked her to perform oral sex instead. In order to convince her to perform oral sex, the defendant told C.M. it would help her breasts grow. He further encouraged her to use syrup and fruit roll-ups when performing oral sex. C.M. testified that the defendant made her put her mouth on his penis on two occasions. During another visit, the defendant attempted to penetrate C.M. anally. C.M. testified that the defendant sat on the edge of the couch with his legs open and had C.M., naked, stand in front of him. She felt him put his penis where her anus was,

and she screamed. The defendant said they did not have to do it. She testified that these events occurred every time the defendant would watch her, or "every weekend" beginning after the incident in the movie theater.

¶ 11 After the defendant assaulted C.M., he would tell her to take a bath and get ready for bed. He told her that her mother would be home and would get upset if they were "playing that game." C.M. did not tell her mother about what the defendant did to her because he insisted she keep it a secret. Additionally, she did not know if she would be in danger from speaking out. Around the time when C.M. was 9 years old, C.M.'s mother's relationship with the defendant ended and she no longer had to see him.

¶ 12 C.M. did not tell her mother about the abuse until C.M. was 18 years old. C.M. and her mother were in a car and in the middle of an argument. C.M.'s mother accused C.M. of rebelling as if she had suffered childhood trauma. C.M. responded by screaming that she had been abused. After picking up C.M.'s younger siblings, C.M.'s mother took C.M. to the police station, where C.M. reported what the defendant did to her. C.M. was eventually interviewed by two police detectives and an assistant state's attorney.

¶ 13 Ada Marshall, C.M.'s mother, also testified at trial. She testified that she was in a relationship with the defendant between 2002 and 2006. Ms. Marshall testified that she was approximately 22 years old when she began dating the defendant, who was 13 or 14 years older. Ms. Marshall confirmed that she left C.M. in the defendant's care on the weekends when she was working, and that the defendant was the only adult watching C.M. at those times. She testified that her relationship with the defendant between 2002 and 2006 was not continuous, but would cease temporarily before resuming, until it ended altogether in 2006. Ms. Marshall testified that she did not leave C.M. with the defendant during their temporary break-ups.

¶ 14    Ms. Marshall testified that C.M. first told her of the abuse she suffered during an argument in March 2016, and that after C.M.'s disclosure, they went to a police station to speak with a detective. Following her encounter with the police, Ms. Marshall learned that the defendant was estranged from one of his children, A. She contacted A. and informed the police of their conversation.

¶ 15    At trial, A. testified that until she was 11 years old, she had regular contact with the defendant, her father. While she primarily lived in Kalamazoo, Michigan with her mother, she and her brother would stay at her father's one-bedroom apartment in Chicago on school breaks. During their visits, A. would sleep with the defendant in his bed, while her brother slept on the pull-out sofa in the living area. On one of those occasions, in 2002 or 2003, when A. was 10 or 11 years old, she was falling asleep in the defendant's bed, when the defendant lay down next to her and put his hand up her shirt. A. testified that she was wearing underwear, but no bra. The defendant then massaged her chest, telling her it would help her breasts grow bigger. A. left the room and slept with her brother on the couch. At some point after A. returned to Michigan, she told her mother about the defendant's assault and that she no longer wanted to visit him. A. never resumed visits with the defendant after disclosing the abuse to her mother.

¶ 16    Neither she nor her mother reported the incident until A. was contacted by the Chicago police in the spring of 2016. In response to police questioning, A. reported what the defendant did to her.

¶ 17    On cross-examination, A. testified that in the years following the incident, she reached out to the defendant to invite him to her volleyball tournament and later to her high school and college graduations.

¶ 18    A.'s mother, Sheila Lipsey, also testified. Ms. Lipsey testified that the defendant was the

father of her two children, including A. When A. told Ms. Lipsey what the defendant did to her, Ms. Lipsey called the defendant. The defendant denied that anything had occurred and told Ms. Lipsey that A. dreamt it. Ms. Lipsey did not believe his denial and continued to challenge him. The defendant responded, "well, she's mine, ain't she?" Ms. Lipsey stated that she did not report the incident to the police because A. was "very confused," and Ms. Lipsey did not want to "put her through" what would have occurred as a result of reporting.

¶ 19 Following Ms. Lipsey's testimony, the State rested. The defendant's motion for a directed verdict was denied.

¶ 20 Ivan Lee, the defendant's football teammate, testified on the defendant's behalf. Mr. Lee testified that he had known the defendant since 2000. Mr. Lee and the defendant spent at least three days a week and the weekends at the defendant's house between 2000 and 2003. Mr. Lee testified that he heard of C.M. and saw pictures of A., but never met either girl. He did, however, meet Ms. Marshall at the defendant's residence and out at nightclubs.

¶ 21 The defendant next called a private investigator who testified that there was no movie theater at Fullerton Avenue and Western Avenue in Chicago.

¶ 22 Shawn Sierra, another friend of the defendant, also testified. Mr. Sierra testified that he played football with the defendant in the late 1990s. Between 2003 and 2007, Mr. Sierra spent a significant amount of time at the defendant's house, including on weekends, but never saw or heard of C.M. He may have seen A. there.

¶ 23 The defendant's daughter, Brianna Medley, who was 26 years old at the time of trial, testified that she visited the defendant in Chicago approximately twice a month between the years of 2002 and 2007. Ms. Medley testified that A. visited the defendant once in 1998, when she, too, was there. Ms. Medley testified that to her knowledge, A. never visited the defendant when Ms.

Medley was not present. Ms. Medley knew C.M. and Ms. Marshall, but testified that she was not aware of C.M. ever spending the night at the defendant's residence. Ms. Medley testified that she had a very good relationship with her father.

¶ 24    Following the conclusion of Ms. Medley's testimony, the defendant informed the court that he had two other witnesses, Lorenzo Haley and Jasmine Trujillo, who were not in court. The defendant tried to contact Mr. Haley, who said that he was not in town because he believed he would not be required to testify until the next day. The court responded "that's that," and the defendant moved on to re-call Ms. Marshall.

¶ 25    The defendant elicited testimony from Ms. Marshall that her relationship with the defendant ended because the defendant believed she was having an affair, and that Ms. Marshall had several boyfriends after her relationship with the defendant ended. The defendant also re-called Ms. Lipsey and elicited testimony that A. received a phone call from Ms. Marshall prior to reporting the 2002 incident to the police.

¶ 26    Finally, the defendant re-called C.M. to ask about her prior statements to the police and the assistant state's attorney. Specifically, the defendant asked if C.M. told the assistant state's attorney in her recorded statement that after the incident in the movie theater, the defendant did not touch her again until two months later. C.M. responded that she did not remember. The defendant also asked whether she told the assistant state's attorney that the defendant actually penetrated her in her vagina and anus. C.M. testified that she told them there was an attempt at penetration.

¶ 27    Following the conclusion of C.M.'s testimony, and outside the presence of the jury, the defendant moved to publish C.M.'s videotaped statement as a prior inconsistent statement. The defendant contended that C.M.'s videotaped statement indicated that the defendant did not touch

her for two months following the incident at the movie theater, while at trial, C.M. testified that beginning with the movie theater incident, the abuse continued every weekend for three years. Additionally, the defendant maintained that C.M.'s videotaped statement indicated that the defendant actually penetrated her vaginally and anally, while her trial testimony was that he *attempted* to penetrate her. The State disputed that either statement was inconsistent with C.M.'s trial testimony and declined to stipulate to the admission of the videotape. The defendant withdrew his motion to introduce the videotape.

¶ 28 Next, the court raised the issue of the witness who was unable to appear, and asked the defendant to proffer Mr. Haley's testimony. The defendant stated that Mr. Haley would have testified that he was the defendant's cousin and that he routinely visited the defendant at his home during the week and on the weekends and never saw C.M. Further, Mr. Haley would have testified that the defendant and Ms. Marshall broke up several times during the course of their three-year relationship, and that Ms. Marshall was seeing other men. The court asked if the defendant was seeking a continuance to produce Mr. Haley, to which the defendant responded affirmatively. The court denied the continuance stating that it had informed the defendant that his witnesses needed to be ready on the first day of trial, and Mr. Haley's proffered testimony did not provide any basis to grant the continuance.

¶ 29 Following closing arguments, the jury found the defendant guilty of all five counts of criminal sexual assault. Prior to sentencing, defense counsel moved to withdraw, which was granted. The defendant retained substitute counsel.

¶ 30 In June 2019, substitute counsel supplemented trial counsel's motion for a new trial with allegations of ineffective assistance of counsel. In relevant part, the defendant, through posttrial counsel, alleged that his trial counsel was ineffective for (1) failing to file a written response to the

State's motion to introduce prior crimes; (2) giving witnesses the wrong trial dates; and (3) failing to perfect the impeachment of C.M.

¶ 31    A hearing on the motion was held one month later.  At the hearing, the defendant testified that trial counsel failed to secure the attendance of two of his relatives who were available as witnesses.  The defendant stated that his relatives needed subpoenas in order to take time off work.  The defendant admitted that his counsel mailed the subpoenas, but stated that the subpoenas were for the wrong day.   Trial counsel also testified. With regard to the two witnesses that were not present at trial, counsel stated that their subpoenas did not have the wrong date. Trial counsel testified that he spoke to all witnesses over the phone before trial and told the witnesses to be in court on January 28, but that he may not be able to call them until January 29.

¶ 32    The trial court denied the posttrial motion, finding counsel was not ineffective.  The court proceeded to sentence the defendant to a total of 30 years' imprisonment.

¶ 33                                ANALYSIS

¶ 34    We note that we have jurisdiction to review this matter, as the defendant timely appealed. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); Ill. S. Ct. R. 303 (eff. July 1, 2017).

¶ 35    On appeal, the defendant initially argues that he received ineffective assistance of trial counsel.  Because the trial court conducted an evidentiary hearing on the merits of the defendant's claims of ineffective assistance, we apply a bifurcated standard of review. *People v. Ortega*, 2020 IL App (1st) 162516, ¶ 42.  We defer to the trial court's factual findings unless they are against the manifest weight of the evidence, but review *de novo* the ultimate legal issue of whether counsel provided ineffective assistance. *Id.* Here, the defendant does not challenge the trial court's findings of fact, but argues that the court erred in its conclusion that counsel was not ineffective.

¶ 36    In order to succeed on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that absent counsel's substandard representation, the result of the proceeding would have been different. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 62. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *People v. Veach*, 2017 IL 120649, ¶ 30. We may, if practicable, dispose of an ineffective assistance claim by considering only the prejudice prong without considering counsel's performance. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 37    Initially, the defendant contends that trial counsel was ineffective for failing to mount a "competent[]" argument responding to the State's motion to introduce evidence of the defendant's other crimes. Specifically, the defendant points to counsel's failure to discuss *People v. Donoho*, 204 Ill. 2d 176 (2003), when countering the State's motion.

¶ 38    While other crimes evidence is generally inadmissible to prove the defendant's propensity to commit the charged crime (*Donoho*, 204 Ill. 2d at 170), there is a narrow exception to this rule in cases where the defendant is charged with, *inter alia*, predatory criminal sexual assault of a child (725 ILCS 5/115-7.3 (West 2018)). In predatory criminal sexual assault cases, the court must weigh the probative value of the other crimes evidence against its prejudicial effect when considering its admissibility. *Donoho*, 204 Ill. 2d at 182-83. The factors to consider when determining the probative value of other crimes evidence are: (1) the proximity in time to the charged offense, (2) the degree of similarity to the charged offense, or (3) other relevant facts and circumstances. *Id.* (citing 725 ILCS 5/115-7.3(c) (West 2018)).

¶ 39    Here, the "other crimes" evidence the State sought to introduce occurred within two to four years of the charged crimes. Moreover, there was substantial factual similarity between the

offenses: the defendant told both A. and C.M. that allowing him to perform sex acts on them would make their breasts grow bigger. Both victims were also somewhat close in age: the defendant's daughter was between 10 and 11 years old, while C.M. was between the ages of 6 and 9. And both offenses occurred in the defendant's apartment while he was the only adult present. To be sure, the defendant was accused of assaulting A. on a single occasion, while he assaulted C.M. repeatedly. But this does not detract from the striking similarities between the offenses, particularly when A. refused to see the defendant again after the incident. In other words, the defendant had no further opportunities to assault A., unlike C.M., who was unable to escape the defendant's unceasing abuse. Given the substantial probative value of the other crimes evidence, we cannot agree that defense counsel could have mounted a successful argument to exclude this evidence. As such, the defendant was not prejudiced by counsel's alleged failure to specifically refer to the factors outlined in *Donoho* and section 115-7.3(c)) of the Code of Criminal Procedure.

¶ 40    Next, the defendant argues that counsel was ineffective for failing to perfect the impeachment of C.M. Specifically, the defendant elicited testimony from C.M. that he contended contradicted C.M.'s videotaped statement but was unable to perfect the impeachment because the State refused to stipulate to the authenticity of the videotape and counsel did not have a witness to authenticate the videotape.

¶ 41    But even if counsel were able to perfect the impeachment, there was no reasonable probability it would have affected the outcome of trial. C.M. testified at trial that there was no gap between the incident in the movie theater and the next incident of abuse; *i.e.*, it occurred the very next weekend. However, according to the defendant, in C.M.'s videotaped statement, she told the assistant state's attorney that after the defendant assaulted her in the movie theater, it was two months before his next assault. Additionally, at trial, C.M. testified that the defendant *attempted*

to penetrate her anally and vaginally, while her videotaped statement allegedly revealed that the defendant *actually* penetrated her.

¶ 42    With regard to the timing of the abuse, this is a collateral matter that would have had a limited impact on C.M.'s credibility.  Given the length of time between the abuse and C.M.'s outcry, and C.M.'s very young age at the time of the abuse, her confusion about the length of time between the incidences of abuse is understandable and was not likely to detract from her credibility.  And with regard to the issue of whether the defendant attempted or actually penetrated C.M., this could have had no effect on the jury's finding of guilt, as the defendant was charged with "contact" between his penis and C.M.'s sex organ and anus.  In other words, whether the defendant attempted to penetrate C.M. or actually penetrated her is irrelevant: in either case, the evidence was that the defendant's penis made contact with C.M.'s vagina and anus.

¶ 43    The defendant further argues that counsel was ineffective for failing to file a written motion for a continuance to produce Lorenzo Haley as a witness.  Instead, counsel only (verbally) moved for a continuance after the court prompted him to make such a motion.  But there is no indication the court based its decision to deny the motion for a continuance because of counsel's failure to make the motion of his own accord and in writing.  Rather, the court noted that it had made clear to counsel that his witnesses should have been available the first day of trial.  Further, Mr. Haley's testimony, according to the defendant's proffer, would have been cumulative to the testimony from Mr. Lee and Mr. Sierra, both of whom stated that they never saw C.M. at the defendant's residence during the relevant time period.  Therefore, counsel's alleged failure to take initiative to move for a continuance did not prejudice the defendant.

¶ 44    Finally, the defendant argues that counsel's motion to quash arrest, filed prior to trial, had no legal basis and was indicative of counsel's "inadequately thought out and executed decisions."

It is sufficient to note that we have determined that counsel's performance in no way prejudiced the defendant, and the defendant has not explained by way of argument or citation to authority how the filing of an inartfully titled motion amounts to ineffective assistance. As such, he has forfeited this argument. See *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 207 (2007) (mere contentions without citation to authority do not merit consideration on appeal).

¶ 45 The defendant's second and final argument on appeal challenges the sufficiency of the evidence to convict him. A challenge to the sufficiency of the evidence requires us to consider whether, after viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31. We will not substitute our judgment for the tier of fact's, nor will we reverse a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 46 The defendant maintains that the evidence was insufficient to convict him because C.M.'s testimony was incredible and uncorroborated by physical evidence. Turning first to C.M.'s credibility, the defendant notes that C.M. testified that she was abused every weekend for three to four years, but that her mother testified that there were several times when she and the defendant temporarily broke up during the three-year period they were dating where C.M. did not stay with him on the weekends. In addition, several of the defendant's friends and the defendant's daughter testified that they routinely visited the defendant's residence during the relevant time period and never saw C.M.

¶ 47 It is the responsibility of the trier of fact to assess witness credibility and resolve conflicts in the testimony. *People v. Johnson*, 2021 IL App (1st) 171885, ¶ 72. Here, the jury heard this conflicting testimony, but ultimately determined that it did not detract from C.M.'s credibility. We

cannot say this conclusion was so unreasonable so as to justify reversal of the defendant's conviction. Nor are the lack of specific dates or other corroboration fatal to a guilty finding. Indeed, where, as here, the defendant perpetrated a number of acts over a long period of time, courts have recognized "it is often difficult in the prosecution of sexual abuse cases to pin down the times, date, and places of sexual assault[]." *People v. Bishop*, 218 Ill. 2d 232, 2467 (2006). The jury could reasonably have concluded that a child of C.M.'s age would be unable to recall specific dates of abuse, and that the failure to recall was not indicative of a lack of credibility. For these reasons, we conclude that the evidence was sufficient to convict the defendant.

¶ 48                          CONCLUSION

¶ 49      For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 50      Affirmed.