2024 IL App (1st) 221129

FIFTH DIVISION
January 19, 2024

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-22-1129

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 10589 |
| | ) | |
| JOHN LANEY, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury found defendant John Laney guilty of five counts of predatory criminal sexual assault, and the trial court sentenced him to 30 years in prison. Mr. Laney filed a petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), alleging several claims of ineffective assistance of trial counsel and that he was denied a fair trial because the jury considered improper extraneous, nonevidentiary information during deliberations. On appeal, Mr. Laney does not pursue his ineffective assistance claims, but argues only that he should have been allowed to proceed to a second-stage hearing based on his claim that the jury considered improper nonevidentiary matters. For the following reasons, we affirm.

¶ 2                                  I. BACKGROUND

¶ 3                                      A. Trial

¶ 4    Mr. Laney was charged with multiple counts of predatory criminal sexual assault for offenses he allegedly committed against the victim, C.M., between July 2003 and July 2007, when she was between six and nine years old. We discussed the trial evidence in detail on direct appeal. See *People v. Laney*, 2021 IL App (1st) 192010-U, ¶¶ 7-26. We discuss the evidence here only to the extent necessary to understand this appeal.

¶ 5    Near the beginning of her opening statement, defense counsel told the jury that a case involving the sexual abuse of a child "is one of the most difficult cases to defend" and to "imagine having to defend that case such as this almost 13 years after it allegedly happened during one of the most pervasive sexual abuse movements in history known as the Me Too era." The trial court interjected, warning defense counsel to "get to the point of this case and the opening statement on this case." Defense counsel made no further references to the "Me Too" movement.

¶ 6    The State presented four witnesses: C.M.; C.M.'s mother, Ada M.; one of Mr. Laney's daughters, A.L.; and A.L.'s mother, Sheila L. The defense presented testimony from two friends of Mr. Laney, a private investigator, and Mr. Laney's daughter, Brianna Medley.

¶ 7                                      1. C.M.

¶ 8    C.M. was 21 years old at the time of trial in January 2019. The charged conduct all took place between 2003 and 2007. At that time, C.M. lived primarily with her maternal grandmother. C.M.'s mother, Ada, was living with Mr. Laney, and C.M. spent every weekend with her mother at Mr. Laney's residence—a "high rise on Division and Lake Shore Drive." At the time, Ada worked "[l]ate afternoons to late night," and after C.M. had known Mr. Laney one or two months, Ada would leave C.M. in his care when she worked.

¶ 9    The first time Mr. Laney watched C.M., they went to a movie theater in "the general area" of Western and Fullerton Avenues. C.M. and Mr. Laney sat in separate seats, but during the movie, Mr. Laney asked C.M. to sit on his lap. She did so, and "[h]e slid his hands under [her] underwear and pants and started to rub in between [the] lips of [her] vagina." C.M. said she turned around and asked Mr. Laney what he was doing, and "he said he was just playing." When C.M. said she would tell her mother, Mr. Laney said that she did not need to because they were "just playing." C.M. did not tell her mother what happened at the movie theater.

¶ 10    C.M. described other incidents with Mr. Laney, including a time that he undressed her and "used his fingers to rub on [her] vagina" and another time that he "tried to penetrate [her], but he couldn't because [her] vaginal area was too small." C.M. said "[h]e gave [her] oral sex. He asked [her] to give him oral sex. He would ask for [her] to dance naked and use a broomstick as a pole." C.M. did not enjoy giving him oral sex, but Mr. Laney told her that "it would make [her] breasts grow" and "encouraged [her] using syrup and fruit rollups" during the oral sex. Mr. Laney also tried to penetrate C.M. anally, but when he did, she screamed, so "he said [they] didn't have to do it." She said these things would happen every time Mr. Laney watched her, "[s]o every weekend."

¶ 11    C.M. said that Mr. Laney never said more about not telling her mother, but that "[h]e was just very adamant about not telling her because it was a secret." Eventually, C.M.'s mother ended the relationship with Mr. Laney, and C.M. did not go over to his apartment anymore.

¶ 12    C.M. did not tell her mother what happened with Mr. Laney until March 2016, when C.M. was 18 years old. C.M. and Ada were arguing, and Ada told C.M. that she was "rebelling as if [she] didn't have a perfect lifestyle or [Ada] hadn't protected [her] in the past or *** as if [C.M.] had some trauma done to [her] as a child." It was during this argument that C.M. "screamed" the story of what had happened with Mr. Laney to her mother. C.M. said she was upset, furious, and

"felt like [she] let a burden off." Ada was driving at the time, and after C.M. disclosed what had happened, Ada "stopped home to get [C.M.'s] younger siblings, and [they] went to the police station."

¶ 13    C.M. and Ada filed a police report. C.M. was interviewed by the police officer who took the report. She also met separately with two detectives and an assistant state's attorney. They all interviewed her about what happened.

¶ 14    On cross-examination, C.M. said that, after the first time, the sexual contact continued every weekend for the next three years. She was not aware that, during that time, Mr. Laney and her mother had broken up several times. C.M. said Mr. Laney was always in the residence during the weekends she spent there, but when asked whether he was there every weekend for the entire weekend for all three years she knew him, C.M. said she did not remember.

¶ 15                                    2. Ada M.

¶ 16    Ada testified that she began dating Mr. Laney in 2002 and moved in with him "around September" of that year. At that time, they were in an apartment at Illinois and Franklin Streets, then they moved to a high-rise apartment building at Lake Shore Drive and Schiller Street, near Division Street. C.M. would come to the apartment on Lake Shore Drive and Division Street starting when she was six.

¶ 17    From 2003 through 2008, Ada worked for Jewel Events Catering as a catering event manager. Ada said that she worked mainly afternoon and evening hours and that sometimes her work schedule coincided with when C.M. was staying with her. When it did, Ada would ask Mr. Laney to watch C.M. whenever she had to work, mainly on the weekends. Ada said that she and Mr. Laney broke up frequently, but the relationship officially ended in June 2006. Ada moved out, and C.M. had no further contact with Mr. Laney.

¶ 18    Ada confirmed that in March 2016, C.M. told Ada what had happened between her and Mr. Laney. Ada said they were arguing because C.M. was "just behaving really irresponsibly." Ada described C.M.'s conduct during this argument as "hysterical" and "crying." Ada also confirmed that after C.M. had told her about Mr. Laney, they picked up a younger child of hers and drove to the police station.

¶ 19    Ada testified that after Ada and C.M. made the police report, Ada reached out to A.L., who was Mr. Laney's daughter from another relationship. Ada and A.L. had a conversation over the phone, and Ada was given permission to relay the information she received from A.L. to the police.

¶ 20    On cross-examination, Ada said that she and Mr. Laney broke up four or five times over the course of their relationship, during which times she would move out. Ada did not leave C.M. with Mr. Laney during the breakups. Ada knew that Mr. Laney was a football coach and had games on the weekends. Although Ada occasionally went to the games, C.M. did not. Ada said that she did not work every weekend, and that although "[g]enerally, [C.M.] stayed over the weekends," occasionally—maybe one weekend each month—C.M. would not stay with her.

¶ 21                                3. A.L.

¶ 22    A.L. testified that she was 27 years old at the time of trial and the daughter of Mr. Laney and Sheila L. A.L. lived in Kalamazoo, Michigan, her whole life. Mr. Laney had lived there briefly too, when she was a child, but lived in Chicago during most of her childhood.

¶ 23    A.L. said she used to regularly see her father—she would visit him during spring and summer breaks along with her older brother. A.L. would sleep with her father in his bed, while her brother slept in the living room. A.L. said that one night when she was 10 or 11 years old, she was either sleeping or falling asleep in her father's bed and her father "reached his hand up [her] shirt to massaged [*sic*] [her] chest. He told [her] if [she] massaged [her] chest, they would grow bigger

and faster." That had never happened before. After the visit, A.L. told her mother that she did not want to visit Mr. Laney again and explained why. She did not see her father again after that incident.

¶ 24                                4. Sheila L.

¶ 25    Sheila L. testified that Mr. Laney was the father of her children (A.L. and A.L.'s brother) and that she and Mr. Laney were in a relationship in the early 1990s. When the relationship eventually ended, Mr. Laney moved to Chicago, but the children continued to have a relationship with their father and visited him there. Sheila confirmed that after a trip to visit Mr. Laney when A.L. was 10 or 11 years old, A.L. told Sheila that she did not want to go back to see her father. Sheila had a conversation with A.L. as to why, during which A.L. "disclose[d] something." Based on that conversation, Sheila contacted Mr. Laney over the phone and confronted him about inappropriate touching. Sheila said that Mr. Laney "denied what occurred," accused A.L. of dreaming it happened, but at one point also said, " 'well, she's mine, ain't she.' "

¶ 26                            5. Ivan Lee and Shawn Sierra

¶ 27    The defense presented the testimony of Ivan Lee and Shawn Sierra, who knew Mr. Laney from the football team he had played on and coached. Both said they spent a significant amount of time with Mr. Laney—Mr. Lee from 2000 to 2003 and Mr. Sierra from 2003 to 2007—including on the weekends. They both testified that they never saw C.M. at Mr. Laney's apartment. Both testified that Mr. Laney's apartment was on Orleans Street.

¶ 28                                6. Lawrence Moore

¶ 29    Lawrence Moore, a private investigator, testified that he was hired by the defense to investigate the intersection of Fullerton and Western Avenues to see if there was a movie theater there. Mr. Moore said he went to the location and "discovered there was no theater there." On

cross-examination, Mr. Moore said he was not aware that there was a theater located at 2600 North Western Avenue, just north of Fullerton Avenue which was at 2400 north.

¶ 30                                7. Brianna Medley

¶ 31    Brianna Medley testified that she was 26 years old, lived in California, and was the daughter of Mr. Laney. She visited her father in Chicago every other weekend from 2002 to 2007 at his apartment on Lake Shore Drive and said "[h]e's always lived there." She said no one visited at the same time she did. Ms. Medley knew A.L. and said A.L. visited Mr. Laney at the Lake Shore Drive residence once when she was there. Ms. Medley said she believed that was in 1998, and to the best of Ms. Medley's knowledge, A.L. never visited Mr. Laney besides the time that Ms. Medley was also there.

¶ 32    Ms. Medley said she knew C.M., but she was not aware of C.M. ever spending the night at Mr. Laney's apartment. Ms. Medley also knew Ada. Ms. Medley knew Mr. Laney played football and went to games with him but did not remember Ada or C.M. ever being at a game.

¶ 33                                8. Jury Instructions and Deliberations

¶ 34    With no objection from the defense, the court instructed the jury, based on Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014), "[y]ou should consider all the evidence in the light of your own observations and experience in life."

¶ 35    The jury began deliberations at 2:51 p.m. At approximately 5:40 p.m. the trial court received a note from the jury. While the court waited for both parties to be present, the court received another note. Just before 6 p.m., the court read the notes. The first one said: "Are there further instructions if we are unable to reach a unanimous verdict." The second said "We are making progress. We will communicate shortly."

¶ 36    The judge decided not to respond.

¶ 37    The jury was back at 6 p.m., finding Mr. Laney guilty of five counts of predatory criminal sexual assault. When polled, each juror agreed that it was their verdict.

¶ 38    The court sentenced Mr. Laney to a minimum sentence of mandatory consecutive terms of 6 years each on each count, for a total of 30 years.

¶ 39                                    B. Direct Appeal

¶ 40    Mr. Laney appealed, arguing the evidence was insufficient to sustain his conviction and that his trial counsel was ineffective. This court affirmed his convictions. See *Laney*, 2021 IL App (1st) 192010-U.

¶ 41                              C. Postconviction Proceedings

¶ 42    In his *pro se* postconviction petition, filed on March 28, 2022, Mr. Laney made several arguments, including multiple claims of ineffective assistance of trial counsel. In addition, Mr. Laney argued that the jury improperly considered personal stories in support of C.M. and used "Me Too" as an argument in favor of conviction, which he described as jury misconduct. Mr. Laney supported this claim with a blog post allegedly authored by a juror in his case.

¶ 43    Mr. Laney attached a printout of the blog post to his petition. In the post, dated January 30, 2019, the writer, "Dave," said he was a juror in "State of Illinois vs. John Laney." In the post, Dave summarized the charges, the witnesses, and the evidence. In explaining the jury's deliberation, Dave said that the "[i]nitial impulse was [Mr. Laney] [wa]s guilty, but struggled regarding whether he was guilty 'beyond a reasonable doubt.' " Dave said that "[p]eople were emotional, and shared personal stories in support of [C.M.]." Dave listed things "in favor of John," referring to Mr. Laney, including "the credibility of [C.M.]." Dave then listed things "in favor of [C.M.]" including the credibility of A.L. and

          "the Me Too movement of encouraging abuse victims to come out and bring their attackers

to justice, that we should believe them when they do come out (actually, the Defense mentioned the 'Me Too' movement in their opening statement to cast doubt on [C.M.]'s testimony but the judge immediately cut them off along this line of reasoning ironically, in the end, many of the jury used 'Me Too' as an argument in favor of [C.M.].)"

Dave explained that the first two votes were not unanimous, but that the jury "[f]inally reached [a] unanimous vote of guilty."

¶ 44    On June 22, 2022, in a 20-page written order, the circuit court dismissed Mr. Laney's petition as frivolous and patently without merit. With respect to his claim of jury misconduct, the court said, in relevant part, that the jury instructions invited the jury to share their "own observations and experience in life," so the fact that they did so was proper. In addition, the court said:

"The 'Me Too' movement may have been exactly one of these life experiences that the jurors found pertinent to the credibility issue. As such, this consideration does not impeach the jury's verdict—especially when considering that [Mr. Laney] invited this consideration during opening arguments when they seemingly brought this up in an attempt to discredit the victim's outcry as trendy."

Accordingly, the court found Mr. Laney's jury misconduct argument to be frivolous and patently without merit.

¶ 45    This appeal followed.

¶ 46                                    II. JURISDICTION

¶ 47    The circuit court dismissed Mr. Laney's postconviction petition on June 22, 2022, and Mr. Laney timely filed his notice of appeal from that dismissal on July 14, 2022. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art.

VI, § 6), and Illinois Supreme Court Rule 606 (eff. March 12, 2021) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings.

¶ 48                                III. ANALYSIS

¶ 49     The Act allows a criminal defendant to challenge his or her conviction by establishing that "in the proceedings which resulted in [the] conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2020). Postconviction proceedings occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines, without input from the State, whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2020). If the petition is advanced to the second stage, the court appoints counsel to represent the defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2020). If the defendant then makes a substantial showing of a constitutional violation, he or she proceeds to the third and final stage, an evidentiary hearing on the merits. *People v. Tate*, 2012 IL 112214, ¶ 10; 725 ILCS 5/122-6 (West 2020).

¶ 50     "A post-conviction petition is considered frivolous or patently without merit" at the first stage of proceedings "only if the allegations in the petition, taken as true and liberally construed, fail to present the 'gist of a constitutional claim.' " *People v. Edwards*, 197 Ill. 2d 239, 244 (2001) (quoting *Gaultney*, 174 Ill. 2d at 418). We review the summary dismissal of a petition *de novo*. *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 51     On appeal, Mr. Laney argues that the circuit court erred in dismissing his petition because, based on the printed-out blog post he attached to his petition, he presented the gist of a claim that his right to a fair trial was violated where members of the jury improperly considered extraneous,

nonevidentiary information during deliberations as weighing in favor of conviction. Specifically, Mr. Laney argues that the jurors introduced extraneous information by "cit[ing] their own personal experiences and what they had heard about the experiences of others \*\*\* as bolstering C.M.'s credibility and favoring a finding of guilt."

¶ 52 Mr. Laney's claim rests on the fact that "[b]oth the United States and Illinois Constitutions guarantee an accused a jury that is impartial [citations], which means 'a jury capable and willing to decide the case solely on the evidence before it.' " *People v. Olinger*, 176 Ill. 2d 326, 353 (1997) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). However, "[a]s a general rule, a jury verdict may not be impeached by the testimony of the jurors." *People v. Hobley*, 182 Ill. 2d 404, 457 (1998). "This rule prevents the admission of a juror's affidavit to show the 'motive, method or process by which the jury reached its verdict.' " *Id.* (quoting *People v. Holmes*, 69 Ill. 2d 507, 511 (1978)). "The rule against admitting juror testimony to impeach a verdict does not, however, preclude juror testimony or affidavits which are offered as proof of improper extraneous influences on the jury." *Id.* at 457-58.

¶ 53 These concepts have been codified in Illinois Rule of Evidence 606(b) (eff. January 1, 2011), which provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify (1) whether any extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was

a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received concerning a matter about which the juror would be precluded from testifying."

See also Fed. R. Evid. 606(b).

¶ 54 There is a strong public policy behind this limitation on impeaching the jury's verdict. As explained by our supreme court:

" ' "[If it is] established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication [then] all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." ' " *Hobley*, 182 Ill. 2d at 457 (quoting *Tanner v. United States*, 483 U.S. 107, 119-20 (1987), quoting *McDonald v. Pless*, 238 U.S. 264, 267-68 (1915)).

Indeed, this public policy has only become more significant in the digital age, where jurors may process their jury experience in an easily searchable public forum, such as the blog post in this case.

¶ 55 Because we are at the first stage of proceedings, we will assume that this blog post was indeed written by a juror on Mr. Laney's case and that it accurately describes the jury's deliberations, as, at this stage, we take the defendant's allegations as true and construe them liberally. *Edwards*, 197 Ill. 2d at 244. The rule then requires us to decide whether the matters

referenced in the blog post constitute "extraneous prejudicial information" that the jury "improperly" considered. Ill. R. Evid. 606(b) (eff. Jan. 1, 2011).

¶ 56 The United States Supreme Court has stated that information is " 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, 574 U.S. 40, 51 (2014). " 'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id.*

¶ 57 In *Warger*, the plaintiff sued for negligence following a collision between his motorcycle and the defendant's vehicle. *Id.* at 42. After the jury found in favor of the defendant, the plaintiff moved for a new trial, arguing that one of the jurors had lied during *voir dire* "about her impartiality and ability to award damages." *Id.* at 43. In support, the plaintiff sought to introduce an affidavit from another juror who stated "that [Ms.] Whipple had spoken during deliberations about 'a motor vehicle collision in which her daughter was at fault for the collision and a man died,' and had 'related that if her daughter had been sued, it would have ruined her life.' " *Id.* The United States Supreme Court reasoned that the affidavit was properly excluded because it was internal rather than external: "[Ms.] Whipple's daughter's accident may well have informed her general views about negligence liability for car crashes, but it did not provide either her or the rest of the jury with any specific knowledge regarding [the defendant's] collision with [the plaintiff]." *Id.* at 51-52.

¶ 58 In a similar analysis, in *Hobley*, the Illinois Supreme Court found that the conduct of the jury foreperson was an internal matter that could not be used to impeach a jury verdict. *Hobley*, 182 Ill. 2d at 463. The defendant in *Hobley* claimed that the foreperson, "a police officer, sought to intimidate other jurors, and offered himself as an 'expert' in the area of proper police conduct."

*Id.* The defendant supported his argument with statements in juror affidavits that the foreperson " 'wanted everyone to know that he was a police officer,' " "showed everyone his gun on the first day of jury selection," and " 'said that [the defendant] was guilty and that [the jury's] decision was going to be unanimous." *Id.* In rejecting the defendant's argument, our supreme court explained:

> "[The] [d]efendant's claim in this regard does not concern an outside influence on the jury but, rather, goes to the 'motive, method or process' by which the jury reached its verdict. [The] [d]efendant seeks to show how a particular juror influenced other jurors during the deliberations. The evidence offered by [the] defendant pertains to the deliberative process of the jury in reaching a verdict and, as such, may not be used to impeach the jury verdict."
> *Id.*

The *Hobley* court went on to explain that the jury foreperson "did not conduct an independent investigation of the case" but "simply offered his opinion on matters of credibility based upon his particular experience as a police officer." *Id.* at 464-65. Because "[j]urors are entitled to consider the evidence presented in light of their own knowledge and observation in the affairs of life," "no improper evidence was interjected into the jury's deliberations in th[at] case." (Internal quotation marks omitted.) *Id.* at 465.

¶ 59     The cases that Mr. Laney cites are quite different as they involved "extraneous" and "prejudicial" information. In *Holmes*, 69 Ill. 2d at 509-10, for example, there was evidence that, during trial, several members of the jury went to a shoe store to inspect the brand of shoes that a police officer had testified matched both boot prints from the defendant and those left by the assailant. In *People v. Caguana*, 2020 IL App (1st) 180006, ¶ 15, one of the jurors "looked up th[e] case" outside of the courtroom and learned the defendant's father had tried to have two witnesses in the defendant's case killed. (Internal quotation marks omitted.) Another juror had also

14

seen this information. *Id.* In *Holmes* and *Caguana*, the courts found that the jurors had been exposed to *outside information* that related directly to issues in the defendant's case, resulting in potential prejudice. *Holmes*, 69 Ill. 2d at 519; *Caguana*, 2020 IL App (1st) 180006, ¶ 44. And in *People v. Willmer*, 396 Ill. App. 3d 175, 178-79, 181 (2009), another case that Mr. Laney cites, the court found the jury was exposed to "some form of improper extraneous information" when a juror researched the "Illinois law 'defining the [o]ffense' with which [the] defendant had been charged" on his home computer, then "read that 'section' on the computer and discussed that information with the jury the following day after it had resumed its deliberations."

¶ 60      The information purportedly considered by the jury in this case is similar to that in *Warger* and *Hobley*. It is the kind of information that the jury is invited to consider in its deliberations under the pattern jury instructions. As in *Warger*, the jurors sharing personal stories and discussing the "Me Too" movement "may well have informed [their] general views" about the credibility of sexual assault victims, but there is no indication that they provided "the jury with any specific knowledge regarding" Mr. Laney's case itself. *Warger*, 574 U.S. at 51-52. And, like *Hobley*, this effort to impeach the verdict goes directly to the " 'motive, method or process' by which the jury reached its verdict," and does "not concern an outside influence on the jury." *Hobley*, 182 Ill. 2d at 463.

¶ 61      As the State points out and the circuit court noted in its written order, the trial court in this case specifically instructed the jury to "consider all the evidence in the light of your own observations and experience in life," pursuant to Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014). See *People v. Tye*, 141 Ill. 2d 1, 25 (1990) ("Indeed, a juror may consider the evidence presented at trial in the light of the juror's own observations and experience in life." (Internal quotation marks omitted.)). And, here, the jurors considered their own

experiences and observations, as they were instructed to do by the court. There is no suggestion in the blog post that any member of the jury did their own investigation into any aspect of this case. The facts about the Me Too movement that the jury considered, according to the blog post, is simply not the kind of "extraneous" or "prejudicial" information that a defendant can rely on to impeach a jury verdict.

¶ 62    While the circuit court also pointed out that the defense lawyer herself raised the Me Too movement in opening statement, we do not find that determinative. What matters here is that, while their awareness of the Me Too movement may have helped to convince some jurors that C.M. was credible despite the long delay in her reporting, this is exactly the kind of information that jurors will inevitably bring into deliberations and cannot be used to impeach a verdict.

¶ 63    We agree with Mr. Laney that at this point he was required only to put forward the "gist" of a constitutional claim. However, because the blog post that he relies on here—which we assume at this stage accurately reflects the jury's deliberation—does not report that the jury was presented with improper extraneous information, Mr. Laney has failed to state the gist of a claim that his right to a fair trial was violated. Accordingly, we find that the circuit court properly dismissed his postconviction petition.

¶ 64                                    IV. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 66    Affirmed.

*People v. Laney*, 2024 IL App (1st) 221129

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-10589, the Hon. Ursula Walowski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Gilbert C. Lenz, of the State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People. |